UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
DANNY RODRIGUEZ,
:
                     Plaintiff,                    04 Civ. 3787 (DAB) (DF)
:
         -against-               **REPORT AND**
:               **RECOMMENDATION**
CAPTAIN MORTON, et. al.,
:
             Defendants.
------------------------------------------------------------------------X

**TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

      In this civil rights action brought pursuant to 42 U.S.C. § 1983, *pro se* plaintiff

Danny Rodriguez ("Plaintiff")[1] claims that his federal constitutional rights were violated by

current and former employees of the New York State Department of Correctional Services

("DOCS"), while he was incarcerated in June 2002, at Downstate Correctional Facility

("Downstate"), in Fishkill, New York.[2]  Liberally construed, Plaintiff's Complaint alleges that

defendants – six corrections officers (James D. Gori, Terrence Stevens, Edwin B. Scott,

Jose L. Crespo, Barryn Anderson, David A. Correia), Sergeant James Chamberlain,[3] and former

---

    [1] Although Plaintiff commenced this action under the name "Danny Rodriguez" and all of his submissions in the case have been made in that name, Plaintiff testified at his deposition that this is a "phoney name" and that his real name is "Manuel Castro."  (*See* Declaration of Donald Nowve, Esq., in Support of Motion for Partial Summary Judgment, dated June 6, 2008 ("Nowve Decl.") (Dkt. 71), Ex. B (Deposition of Danny Rodriguez, conducted Feb. 17, 2006 ("Pl. Dep.")), at 104.)

    [2] Downstate is a reception center where inmates are assigned upon their entry or return to DOCS custody.  It appears that Plaintiff has now been released from custody and resides in Brooklyn, New York.  (Dkt. 81.)

    [3] Sergeant Chamberlain has since retired from the New York State Department of Correctional Services.

Captain Robert I. Morton Jr. (sued herein as "Captain Morton")[4] (collectively, "Defendants") – employed excessive force and were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment.  Plaintiff also makes generalized claims that Defendants violated his equal protection and due process rights.

Defendants have moved for partial summary judgment.  (*See* Notice of Motion for Partial Summary Judgment, dated June 6, 2008 ("Notice of Motion") (Dkt. 69).)  Defendant Morton seeks dismissal of all of Plaintiff's claims against him, on the ground that he had no personal involvement in any of the events that underlie Plaintiff's claims.  (*See* Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment, dated June 6, 2008 ("Def. Mem.") (Dkt. 70), at 2.)  While the remaining defendants do not challenge that they were involved in the incident that gave rise to Plaintiff's excessive force claim, they seek dismissal of Plaintiff's other claims against them – *i.e.,* the deliberate indifference, equal protection and due process claims – on the ground of lack of personal involvement.  (*See id.*, at 1.)  For the reasons set forth below, I recommend that Defendants' motion for partial summary judgment (Dkt. 69) be granted and that all claims in this action be dismissed, except for Plaintiff's claims for excessive force against defendants Gori, Stevens, Scott, Crespo, Anderson, Correia, and Chamberlain.

---

[4] At all times relevant to this action, defendant Morton was a captain at Downstate.  (*See* Declaration of Robert I. Morton, Jr., dated June 5, 2008 ("Morton Decl.") (Dkt. 76), at ¶ 2.) Currently, he serves as Deputy Superintendent of Security Services at Ulster Correctional Facility.  (*Id.*)

## FACTUAL BACKGROUND

### A.   The Bullpen Incident

_____ On June 28, 2002, Plaintiff was temporarily confined to Downstate upon his return from a court appearance in Brooklyn, New York.  (*See* Complaint, filed March 31, 2004 ("Compl.") (Dkt. 2).[5])  During mealtime for inmates in the bullpen area,[6] Plaintiff had a verbal dispute with defendant Officer Gori concerning a food service tray.  (*See* Pl. Dep., at 15-20.)  The verbal dispute escalated to a physical altercation between Plaintiff and various responding officers. (*See* Nowve Decl, Ex. C (Use of Force Report ("UOF Report")), at 113-15; *id.* (Unusual Incident Report ("UI Report")), at 121-27; *see also* Pl. Dep., at 31-32.)  According to an Inmate Misbehavior Report, Plaintiff disobeyed a direct order to leave the bullpen, and upon a second order, Plaintiff attempted to throw a punch at Officer Gori.  (*See* Nowve Decl., Ex. C (Inmate Misbehavior Report ("IMR")), at 155; *see also* UOF Report, at 113.)  Plaintiff, however, claims that he did not provoke the incident or offer any resistance (Pl. Dep., at 21-25), and that the responding officers repeatedly beat him (*id.*, at 21-23).  Moreover, Plaintiff alleges that the responding officers did not treat him fairly during the bullpen incident and, instead, treated him "like an animal."[7]  (Pl. Dep., at 126-28.)

---

[5] Although the Court's docket reflects a filing date of May 19, 2004 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the Complaint to have been filed on March 31, 2004, the date when Plaintiff signed it, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

[6] The "bullpen" is the holding area where inmates are administratively classified when they are transported to or from Downstate.  (*See* Def. Mem., at 2.)

[7] Plaintiff's subjective belief that he was not treated fairly during the bullpen incident appears to be the basis for his equal protection claim.  (*See* Compl., at ¶ V; Pl. Dep., at 126-28.)

According to Plaintiff, all of the named Defendants were involved in his beating, except for defendant Morton.  Plaintiff claims that, after the beating, a captain – who Plaintiff initially believed was female – arrived at the scene.  (*Id.*, at 46-47, 120-21; *see also* Plaintiff's Declaration in Opposition to Defendant's Partial Summary Judgment Motion, dated June 1, 2008 ("Pl. Decl.") (Dkt. 80), at ¶¶ 8, 16 (conceding that this captain arrived at the scene after the incident occurred and had no direct involvement in his alleged beating).[8])  Based on Plaintiff's deposition testimony, this captain "[j]ust looked at [Plaintiff] and told [the other officers] to take [Plaintiff] to the hospital."  (Pl. Dep., at 46.)  Plaintiff assumed that the "captain" in question was defendant Morton, even though Morton is male, because, to his understanding, "Captain Morton . . . [was] the one that had the authority."  (*Id.*; *but see* Pl. Decl., at ¶ 8 ("It's true I assumed it was Captain Morton, but I would never swear under oath that it was him.").)  Although Morton has no recollection of witnessing the alleged beating, he admits that he was on duty on June 28, 2002.  (*See* Morton Decl., at ¶ 5.)

B.   **Plaintiff's Injuries and Medical Treatment**

After the bullpen incident, medical personnel at Downstate (none of whom are named as defendants in this action) examined Plaintiff and treated him for the injuries he sustained.  (*See* UOF Report, at 113-15; UI Report, at 121-27.)  The examination revealed minor bumps and small abrasions to Plaintiff's right eye, forehead, nose, arms, knees, and upper back.  (*See* UOF Report, at 114-15; UI Report, at 122.)  Plaintiff also suffered superficial lacerations above his

---

[8] Plaintiff has apparently dated his declaration and opposition brief incorrectly.  Although both documents are dated June 1, 2008 (*see* Pl. Decl.; Plaintiff's Brief in Opposition to Defendants['] Partial Summary Judgment Motion, dated June 1, 2008 ("Pl. Mem.") (Dkt. 79)), Defendants did not move for partial summary judgment until June 6, 2008 (*see* Notice of Motion).

4

left eyebrow, which doctors closed with five sutures.  (*Id.*)  Photographs of Plaintiff taken immediately after the incident confirm the reported bruises and injuries.  (*See* Pl. Decl., Ex. A (photographs of Plaintiff).)  Plaintiff testified that, despite his injuries, he received no pain medication while at Downstate.  (Pl. Dep., at 83.)[9]

Nothing in the medical documentation from Downstate suggests that Plaintiff was so severely injured that he could not be transferred following the incident, and, that same day, Morton apparently directed that Plaintiff be transferred to the Green Haven Correctional Facility ("Green Haven").  (*See* UI Report, at 122.)[10]  Plaintiff asserts that his transfer from Downstate on the day of the bullpen incident impeded his medical treatment because he did not receive "painkillers . . . ice . . .  [or] Motrin," and because it delayed the removal of his sutures past the date when then they were supposed to have been removed.  (Pl. Dep,. at 82.)  Plaintiff does not allege that any other defendant other than Morton was responsible for the transfer.  (Pl. Decl., at ¶ 16; Pl. Dep., at 80-83.)

After his transfer to Green Haven, Plaintiff requested and received Motrin on July 1, 2002, three days after the incident at Downstate.  (Pl. Dep., at 86.)  On July 5, 2002, Green Haven doctors removed Plaintiff's sutures.  (*Id.*)  In August 2002, Plaintiff was transferred from Green Haven to the Elmira Correctional Facility ("Elmira").  (*Id.*, at 75.)  From September

─────────────────────

[9] Although, in his declaration, Plaintiff states that doctors at Downstate prescribed Ultram, a pain medication, for him (*see* Pl. Decl., ¶ 16 ("I am being prescribed ULTRAMS as a medication for my back injury for the pain, from the Doctors here at Downstate Correctional Facility, but no such plan towards recovery nor has one been discussed.")), this reference to Downstate appears to be a typographical error, as, elsewhere in his declaration, Plaintiff makes the same statement, but with reference to doctors at Attica Correctional Facility (*see id.*, at ¶ 11).

[10] Morton does not recall giving the transfer order (Morton Decl., at ¶ 5), but does not dispute that he did so.

through October 2002, while at Elmira, he was prescribed Motrin on at least three additional

occasions.  (*See id*., at 75-76, 87.)  Overall, during the period from July through October 2002,

Plaintiff was seen 18 times by medical staff at either Green Haven or Elmira.  (*Id*., at 84.)

In opposition to Defendants' motion, Plaintiff has submitted a medical note from his

examining physician, Shaikh M. Hasan, M.D., dated June 25, 2007, indicating that he suffers

from severe back pain associated with walking.  (Pl. Decl., Ex. C.)  Plaintiff has also submitted a

letter from Doshi Diagnositics, an X-ray imaging service, stating that Plaintiff's X-ray on

June 14, 2007 indicated that he suffers from a "mild loss of disc space height at L5-S1" and a

"moderate loss of disc space height at L1-2" in his "lumbar spine" (*Id.*)  Plaintiff has offered no

evidence, however, to demonstrate that the conditions reported in these two submissions are

causally related to the bullpen incident.

### C.     Plaintiff's Disciplinary Hearing

As a result of the bullpen incident, Plaintiff was charged with violating several rules of

conduct.  (*See* IMR, at 155.)  Plaintiff was notified of the disciplinary charges on July 2, 2002,

three days before his Tier III disciplinary hearing[11] began.  (*See* Nowve Decl., Ex. C (Hearing

Record Sheet), at 163.)  Prior to the hearing, Plaintiff requested and received the assistance of a

sergeant in preparing for the hearing.  (*See id.* (Notice of Assistance and Assistant Form), at 156-

58.)  At the Tier III hearing conducted by a Green Haven hearing officer, Officer Maddox,[12]

Plaintiff called four witnesses to testify on his behalf by speaker phone.  (*See id.* (Disciplinary

---

[11] Tier III hearings are held for "the most serious violations of institutional rules." *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).

[12] Officer Maddox's first name appears in his signature on several documents in the record, but the signature is illegible.  (*See, e.g.,* Nowve Decl., Ex. C (Disciplinary Hearing Witness Interview sheets), at 160, 162.)

Hearing Witness Interview sheets), at 160, 162; Pl. Dep., at 70.)  Plaintiff was found not guilty

of Assault on Staff, but guilty of Violent Conduct and Refusing a Direct Order, and he was

ordered to spend 12 months in confinement in Green Haven's Special Housing Unit.  (*See*

Nowve Decl., Ex. C (Hearing Disposition), at 164-65; Pl. Dep., at 72-73.)  The decision was

affirmed on appeal on October 16, 2002.  (*See* Nowve Decl., Ex. C (Hearing Review), at 167; Pl.

Dep., at 76-77.)

## PROCEDURAL BACKGROUND

Plaintiff filed two grievances concerning the beating he allegedly received during the

bullpen incident, and his purported lack of medical care thereafter.  (*See* Nowve Decl., Ex. C

(Grievance Record and Case History); Pl. Dep., at 78-83.)  Both grievances were denied.  (*See*

Grievance Record and Case History; Pl. Dep., at 79-80.)  Plaintiff's appeals of both grievances

to the "superintendent level" also were denied.  (*See id.*)  Finally, Plaintiff's grievances again

were denied by the Central Office Review Committee, the third and final step in the inmate

grievance process.  (*See id.*)

On March 31, 2004, Plaintiff filed his Complaint in this Court under 42 U.S.C. § 1983.

(Dkt. 2.)  Citing a number of federal constitutional provisions, the Complaint asserts three

claims, which, liberally construed, appear to allege that Defendants:

> (1)    used excessive force during the bullpen incident, resulting in a
> violation of Plaintiff's Eighth Amendment right against cruel and
> unusual punishment;
>
> (2)    showed deliberate indifference to Plaintiff's medical needs by
> refusing to provide him with medical treatment after the bullpen
> incident and by transferring him to Green Haven, in violation of
> his Eighth Amendment rights; and

> (3)     violated Plaintiff's equal protection and due process rights as a
> result of the alleged beating during the bullpen incident and in the
> course of his subsequent Tier III disciplinary hearing.

(*See* Compl., at ¶¶ IV and V and Statement of Facts attached thereto.)

On June 6, 2008, Defendants filed their motion for partial summary judgment.

Defendant Morton moves for summary judgment dismissing all of Plaintiff's claims against him.

(*See* Def. Mem., at 1-2, 7.)  The remaining Defendants move to dismiss Plaintiff's deliberate

indifference, equal protection, and due process claims.  (*See id.*, at 1-2, 7-9.)

**DISCUSSION**

## I.     SUMMARY JUDGMENT STANDARDS

### A.     Rule 56

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary

judgment may be granted when the parties' sworn submissions show that "there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v.

KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996).  The moving party bears the burden of

showing that no genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 157 (1970).  In considering a motion under Rule 56, the Court must "view the evidence in

the light most favorable to the party against whom summary judgment is sought and must draw

all reasonable inferences in his favor."  *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d

Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).

Nonetheless, opposition to summary judgment "may not rest upon the mere allegations or

denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is

a genuine issue for trial."  Fed. R. Civ. P. 56(e).  This means that "[t]he non-moving party may

not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d

105, 114 (2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)),

but, rather, must present "significant probative evidence tending to support the complaint."

*Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 U.S. Dist. LEXIS 4943, *9 (S.D.N.Y. Mar. 25,

2002) (citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968)).  "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 249-50 (1986) (citations omitted).

 Where the party opposing summary judgment is proceeding *pro se*, the Court must read

that party's papers liberally and interpret them "to raise the strongest arguments that they

suggest."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks

and citation omitted).  Yet even a *pro se* plaintiff cannot defeat a motion for summary judgment

by relying merely on the allegations of a complaint.  *See Champion v. Artuz*, 76 F.3d 483, 485

(2d Cir. 1996).  Rather, when confronted with evidence of facts that would support summary

judgment in the defendant's favor, the plaintiff must come forward with evidence in admissible

form that is capable of refuting those facts.  *See* Fed. R. Civ. P. 56(e); *see also Jermosen v.

Coughlin*, 877 F. Supp. 864, 867 (S.D.N.Y. 1999) (*pro se* plaintiffs must present concrete

evidence from which a reasonable jury could return a verdict in their favor in order to defeat

summary judgment).

 **B.** **Local Civil Rule 56.1**

 The local rules of this Court require a party moving for summary judgment under Rule

56 to submit "a separate, short and concise statement of the material facts as to which the

moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  In response,

the opposing party must submit "a correspondingly numbered paragraph responding to each

numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). All statements of fact by either party must be followed by a citation to evidence which would be admissible at trial. Local Civ. R. 56.1(d). Each statement of fact by the moving party "will be deemed admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement . . . by the opposing party." Local Civ. R. 56.1(c).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir. 2000)). Yet, "while a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz*, 258 F.3d at 73 (quoting *Monahan*, 214 F.3d at 292).

In this case, Defendants filed a statement as required by Local Rule 56.1. Although Plaintiff did not do so, he did file a declaration under penalty of perjury, responding, at least in part, to Defendants' factual assertions. (*See generally* Pl. Decl.) Given Plaintiff's *pro se* status, the Court has exercised its discretion to review independently the record before it, including Plaintiff's declaration and deposition testimony, the declarations submitted by Defendants, and the documentary evidence that has been placed before the Court.

## II.    DEFENDANTS' MOTION

### A.    Excessive Force Claim Against Defendant Morton

For the most part, Defendants are not seeking summary judgment with respect to

Plaintiff's excessive force claim.  Only defendant Morton has moved against this claim, on the

ground that he was not personally involved in the alleged bullpen incident.

In order to succeed on a claim under 42 U.S.C. § 1983, Plaintiff must be able to show

that "state officials, acting under color of state law, deprived [him] of a right guaranteed [to him]

by the Constitution."  *Rodriguez v. Phillips*, 66 F.3d 470, 473 (2d Cir. 1995).  The Eighth

Amendment protects prisoners from "cruel and unusual punishment" in the form of

"unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v. Seiter*,

501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 101 (1976).[13]  The defendants'

"personal involvement" in the alleged constitutional violation is, however, "a prerequisite to an

award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal

quotations marks and citation omitted); *accord Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987); *see also Fisk v.

Letterman*, 401 F. Supp. 2d 362, 373-74 (S.D.N.Y. 2005) (dismissing the plaintiff's § 1983 claim

where she failed to allege facts showing that the defendant had been involved in the deprivation

of her rights).  In other words, to recover from a particular defendant, the plaintiff must allege a

tangible connection between that defendant's alleged unconstitutional acts and the injuries

suffered.  *See Gowins v. Greiner*, 01 Civ. 6933 (GEL), 2002 WL 1770772, at *6 (S.D.N.Y.

---

[13] The 14th Amendment makes the Eighth Amendment applicable to the states.  *See id.*

July 31, 2002) (citing *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)); *Johnson v. Bendheim*,

2001 WL 799569, at *5 (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).

      Plaintiff has apparently named Morton because of his supervisory role at Downstate, as

even Plaintiff concedes that this defendant did not participate in the alleged beating and only

arrived on the scene afterwards.  (*See* Pl. Dep., at 46-47, 120-21; Pl. Decl., at ¶ 16.)  While the

mere fact that an official holds a supervisory position is, standing alone, insufficient to establish

that official's liability for the acts of his subordinates, there are several ways in which a

supervisory official may be found personally liable for violating a plaintiff's constitutionally

protected rights.  *See Colon*, 58 F.3d at 873; *Wright*, 21 F.3d at 501.  The supervisory official

may be deemed to have personal involvement where he:  (1) directly participated in the

infraction; (2) failed to remedy the wrong even after learning of a violation through a report or

appeal; (3) created a policy or custom under which unconstitutional practices occurred, or

allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in

managing subordinates who caused the unlawful condition or event; or (5) demonstrated

deliberate indifference to the constitutional rights of the plaintiff by failing to act on information

demonstrating that unconstitutional practices were taking place.  *Colon*, 58 F.3d at 873;

*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001).

      Even reviewing the record in the light most favorable to Plaintiff, it is apparent that

Plaintiff has not come forward with evidence sufficient to warrant a trial against defendant

Morton on the excessive force claim.  Although Plaintiff testified at his deposition that Morton

should be held responsible because he was the "overall boss" at Downstate (*see* Pl. Dep., at

46-47), this, even if true, is insufficient to demonstrate liability.  Plaintiff has not come forward

with any evidence that the bullpen incident was a result of a policy or custom that furthered

unconstitutional practices, or that Morton acted in a grossly negligent manner, or failed to act on information that officers under his control were engaging in an unlawful use of force.  Thus, Plaintiff's excessive force claim against Morton cannot survive summary judgment.  *See Colon*, 58 F.3d at 873-74 (granting summary judgment for defendant prison superintendent and defendant prison commissioner where plaintiff's proffered evidence was insufficient to create a triable issue of fact as to the superintendent and commissioner's personal involvement in, or awareness of, the alleged constitutional violation).

### B.   Deliberate Indifference To Plaintiff's Medical Needs

All of the Defendants are also entitled to summary judgment on Plaintiff's claim that they were deliberately indifferent to his medical needs, as the record contains virtually no evidence to support such a claim.

First, none of the Defendants served as medical personnel at Downstate, and none were involved in, or responsible for, giving Plaintiff medical treatment.  (*See* UOF Report, at 115; UI Report, at 122; Nowve Decl., at Ex. C (Ambulatory Health Record), at 375; *see also* Morton Decl., at ¶ 2; Pl. Dep., at 82-83.)  Nor does the record contain any evidence suggesting that any of the Defendants – as non-medical personnel – had the "authority to intervene" in decisions regarding Plaintiff's treatment.  Absent such evidence, Defendants may not be held liable on any claim that Plaintiff's medical care at Downstate was inadequate.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (plaintiff failed to demonstrate the requisite personal involvement by defendants where plaintiff could not show how defendants could have challenged a doctor's diagnosis).

Second, to the extent Plaintiff is complaining about any of the medical care he received *after* his transfer out of Downstate (*see* Pl. Decl., ¶¶ 4-5, 11, 15; Pl. Dep., at 83), Defendants are

13

entitled to judgment in their favor because the record shows that none of them were even present at Green Haven, Elmira, or other locations to which Plaintiff may have been transferred.

Finally, to the extent Plaintiff has named defendant Morton on his deliberate indifference claim based on the alleged interruption in his medical treatment that was caused by Morton's order to transfer him out of Downstate (*see* Pl. Decl., at ¶ 16; *see also* UI Report, at 122), Plaintiff's claim against Morton must be dismissed because the evidence is insufficient to demonstrate that any such interruption in treatment rose to the level of a constitutional violation. For a deprivation of medical care to implicate a prisoner's constitutional rights, the prisoner's medical needs must indicate "a condition of urgency," such that medical neglect may "produce death, degeneration or extreme pain." *See Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). Such serious medical needs arise where "'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Further, the facts must give rise to an inference that the person charged with the violation knew or should have known of, and disregarded, "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Flemming v. Velardi*, No. 02 Civ.4113 (AKH), 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003); *Johnson v. Bendheim*, No. 00 Civ. 720 (JSR), 2001 WL 799569, at *7 (S.D.N.Y. July 13, 2001).

Here, as noted above, there is nothing in Plaintiff's medical record to suggest that a transfer out of Downstate would have caused – or did cause – any serious risk to his health. Certainly, nothing in the records prepared by the medical staff at Downstate suggests that Plaintiff's injuries were so significant or urgent that it was critical not to delay his treatment. *See*

14

*Stevens v. Goord*, 535 F. Supp. 2d 373, 383 (S.D.N.Y. 2008) (one factor in determining the severity of a prisoner's medical condition is whether a reasonable doctor would perceive the medical need as important (citing *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003))).
Moreover, Plaintiff has proffered absolutely no evidence to suggest that defendant Morton knew of a significant risk to Plaintiff's health and intentionally disregarded it in ordering his transfer. *See Farmer*, 511 U.S. at 837 (upholding lower courts' grant of summary judgment for prison official and stating that, in a medical indifference claim, a prison official will not be held liable unless he knows of and disregards "an excessive risk to inmate health or safety").  Accordingly, any deliberate indifference claim against Morton, based on Plaintiff's transfer, fails to present a triable issue of fact.

### C.    Due Process and Equal Protection Claims

Plaintiff's 14th Amendment due process claim against Defendants appears primarily to be based on his belief that he was not treated fairly during the bullpen incident.  (*See* Pl. Dep., at 125-28.)  Plaintiff alleges, among other things, that Defendant Gori "treated [Plaintiff] like a slave or an animal" and that Defendants "all had a part in beating [Plaintiff] up."  (*Id.*)  Where, as here, a plaintiff's Eighth Amendment and 14th Amendment due process claims "overlap," *Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 162 (N.D.N.Y. 2007), "the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners," *id.* (quoting *Graham v. Connor*, 490 U.S. 386 (1989) ("any protection that 'substantive due process' affords convicted prisoners against excessive force is. . . at best redundant of that provided by the Eighth Amendment")); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("where the deliberate use of force is challenged as excessive and unjustified, . . . the Due Process Clause affords respondent no greater protection than does the Cruel and

Unusual Punishment Clause").  As Plaintiff's due process claim apparently arises out of the same circumstances as his Eighth Amendment claim, the claim is subsumed and must be dismissed.

    To the extent Plaintiff further contends that his due process and/or equal protection rights were violated by the conduct of his eventual disciplinary hearing (*see* Pl. Decl., at ¶ 15 (asserting that hearing officer Maddox "was not fair and impartial")), any such claim must also be dismissed, as the record contains no evidence that the named Defendants were in any way involved in conducting that hearing.  *See Wright*, 21 F.3d at 501.  Finally, if Plaintiff seeks to claim that any of the Defendants, as witnesses to the bullpen incident, made false accusations against him, Defendants would also be entitled to judgment in their favor, as Plaintiff would not be stating a constitutional claim.  *See Freeman v. Rideout*, 808 F.2d 945, 951 (2d Cir. 1986) (prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report).

## CONCLUSION

    For the foregoing reasons, I respectfully recommend that the Court grant Defendants' motion for partial summary judgment (Dkt. 69), dismissing all claims asserted by Plaintiff against defendant Morton, as well as the deliberate indifference, due process, and equal protection claims asserted against the remaining defendants.

    Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, United States Courthouse, 500 Pearl Street, Room 1510, New York, New

16

York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York, 10007. Any requests for an extension of time for filing

objections must be directed to Judge Batts. FAILURE TO FILE OBJECTIONS WITHIN TEN

(10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension

Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d

Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
January 8, 2009

Respectfully Submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Deborah A. Batts, U.S.D.J.

Mr. Danny Rodriguez, *pro se*
317-46th Street
Brooklyn, NY 1122

Donald Nowve, Esq.
Office of New York State Attorney General
120 Broadway, 24th Floor
New York, NY 10271